1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

MARIA MENDOZA,

                Plaintiff,

     v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

             Defendant.

_____

Case No.  1:13-cv-01213-SKO

**ORDER ON PLAINTIFF'S COMPLAINT**

(Doc. No. 15)

## I.   INTRODUCTION

Plaintiff, Maria Mendoza ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act.  42 U.S.C. § 405(g).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---
[1]   The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 7, 8.)

## II.   FACTUAL BACKGROUND

Plaintiff was born in Mexico on October 26, 1957, and initially applied for disability on May 12, 2004.  (AR 694.)  Plaintiff claims she is disabled due to problems including arthritis, degenerative disc disease of the spine, left hand laceration, GERD, hypertension, obesity, insomnia, IBS, chest pain, pelvic pain, hyperlipidemia, recurrent urinary tract infection, headaches, history of stomach ulcer, and history of cataracts. (*See* AR 694-95.)

**A.   Relevant Medical Evidence**

**1.   Reedley Services, County of Fresno**

On November 18, 2002, Plaintiff reported eating and sleeping well and improved symptoms with her prescribed medication, though her overall mood remained "depressed." (AR 257.)  On January 14, 2003, Plaintiff reported an improved relationship with her husband but noted she continued to have angry outbursts (AR 256), and on April 21, 2003, Plaintiff reported on-and-off crying spells (AR 254).  On June 3, 2003, Plaintiff reported doing well on her current medications, with her anxiety under control.  (AR 253.)  On July 28, 2003, Plaintiff reported starting work at a packing house, and noted she was tolerating her usual work stress but having problems at home with her daughter.  (AR 252.)  The progress note contains diagnoses of "Major Depressive Disorder, with psychotic features, in full remission" and "Anxiety Disorder, not otherwise specified." (AR 252.)

On October 10, 2003, Plaintiff was noted as non-complaint with her medication, and Plaintiff reported that she did not take her adjusted Zoloft because "it makes her tired, but then [complained of] not sleeping." (AR 250.)  On October 24, 2003, Doris Tan, D.O., noted that Plaintiff had given her "papers" from the "Welfare Department" asking her to "pay back $552 – bec[ause] of income found in 8/2001 & 9/2001" because she thought Dr. Tan "could magically make the problem go away." (AR 249.)  Plaintiff's husband also informed Dr. Tan that Plaintiff was still not compliant with her medication. (AR 249.)  On November 20, 2003, Plaintiff reported marital problems with her very "macho" husband, describing him as "verbally abusive" and often acting out in anger. (AR 247.) Dr. Tan noted however that when Plaintiff's husband accompanied Plaintiff to her appointments, "he seems to care about her." (AR 247.)  Plaintiff also reported that

2

"Zoloft is helping bec[ause] she is no longer suicidal, as she used to be." (AR 247.) On March 8 and May 17, 2004, Plaintiff reported crying spells, suicide attempts within the past month by cutting her wrist, auditory hallucinations, and having "problems relaxing without Seroquil (*sic*)." (AR 242; 245.) On June 16, 2004, Plaintiff reported "not doing well without medication," having frequent arguments with her husband, being advised by a pastor to try a "trial separation," and "still feeling depressed." (AR 241.)

### 2. Allen Middleton, MD, Psychiatric Review Technique Form and Assessed Mental Residual Functional Capacity

On July 21, 2004, Dr. Allen Middleton, PhD completed a Psychiatric Review Technique Form ("PRTF"), noting that Plaintiff suffered from major depression (AR 262), an affective disorder under Category 12.04 characterized by disturbance of mood (AR 259-72.) Dr. Middleton opined Plaintiff was mildly restricted in her activities of daily living and had no difficulties in maintaining social functioning; he did not opine to whether Plaintiff had any difficulties in maintaining concentration, persistence, or pace, or had experienced any episodes of decompensation. (AR 269.)

In his Mental Residual Functional Capacity ("RFC") Assessment, Dr. Middleton determined that Plaintiff was moderately limited in her ability to understand and remember detailed instruction and her ability to maintain attention and concentration for extended periods, but had no other mental limitations, and concluded that Plaintiff "can do simple easy to remember tasks but would have difficulty w/ more complex instructions." (AR 273-75.)

### 3. Shireen R. Damania, M.D., Psychological Evaluation

On August 17, 2007, Dr. Shireen Damania evaluated Plaintiff with the aid of an interpreter and based on "entirely illegible" "progress notes" from treating physician "Dr. Raymon." (AR 576.) Plaintiff reported she tried "various medications and they caused her to have 'stomach problems,' so she stopped those medications and she stopped seeing a psychiatrist." (AR 576.) Plaintiff reported she had been told she had a "stomach ulcer" and "cataracts" and was "scheduled to have 'surgery on the left eye[.]" (AR 576; *see also* AR 600 (March 23, 2007, specimen tested negative for active ulcer).)

1   Dr. Damania noted that Plaintiff had "worked previously in 'packing houses.' She tried to

2   work again in July of 2007, 'packing grapes' but she had to stop [after] a month." (AR 576-77.)

3   Plaintiff also "indicate[d] that she has had psychiatric hospitalizations previously, in 2001, she

4   tried to 'commit suicide by cutting her wrist,' and on one occasion, she tried to go 'in front of a

5   car'" but "emphatically denie[d] suicidal ideations" during the examination.  (AR 576.)  She

6   reported that her father died in 1971, when "the family was 'fighting and he got in between and

7   was accidentally shot.'"  (AR 576.)

8   When asked how she spends a typical day, Plaintiff reported having problems with "lower

9   back pain" and stated that her "doctor has told her to take it easy" and that her daughter "comes

10  over and helps her with her household chores.  She basically 'does nothing.'"  (AR 577.)  Plaintiff

11  resided with her "disabled" husband, and lived off of his disability.  (AR 576.)  "She frequently

12  state[d], during the course of the interview, that for some reason her 'welfare benefits' were

13  discontinued.  She describe[d] this as 'child support.'  She does have 'MediCal Insurance,' and

14  receives food stamps in the amount of $400.00 a month."  (AR 576.)  Plaintiff also reported

15  "financial problems," pulling out a "file with bills, to show the interviewer regarding her son's

16  'PG&E' and other bills."  (AR 577.)

17  On examination, Plaintiff was "well built and nourished, neatly dressed and groomed, and

18  looking her stated age[,]" with hair "done up and fashionably coiffed" and wearing lipstick.

19  (AR 577.)  Although she was mildly drowsy, which she indicated was due to her "medications,"

20  she

> . . . was cooperative.  She answered the questions in a detailed and appropriate
> manner.  Speech was normoproductive . . . Mood was mildly depressed, although
> she smiled appropriately and on one occasion, even laughed appropriately during
> the course of the interview.  Affect was broad and appropriate to the thought
> content and situation.  She denied any suicidal or homicidal ideations, although
> she did indicate that she had been "suicidal in the past."  Impulse control and
> frustration tolerance were within normal limits.  There was no evidence of
> hallucinations or delusions.  There was no evidence of a thought disorder.  She
> was oriented to time, place and person.  Memory for recent and past recall was
> intact.  Attention span was within normal limits.  She recalled two out of three
> objects in three minutes, after the objects were repeated once.  She was of average
> intelligence.

4

She knew "President Bush" was the current president, but did not recall who the previous president was. She could do simple mathematics such as 2+2=4, but indicated she could not do 5x5 because she only had a "second grade education.["] Insight and judgment were adequate.

(AR 577-78.) Dr. Damania diagnosed Plaintiff with "Depressive disorder, not otherwise specified," hypertension, "stomach ulcer, by history," and "cataracts, by history," determined her level of psychosocial stressors to be mild to moderate due to financial difficulties and unemployment, and assigned her a Global Assessment of Functioning ("GAF") score of 55 to 60.[2] (AR 578.) In his opinion, were Plaintiff "to receive financial benefits, she would be able to handle her funds, judiciously in her own best interest." (AR 578.) In his opinion, Plaintiff

. . . has good interpersonal and social skills. No difficulties were noted in memory, concentration, persistence and pace. There was no evidence of any emotional lability (*sic*) or deterioration.

She is able to understand, carryout and remember simple one and two step job instructions, in an unskilled setting. She is able to respond appropriately to co-workers, supervisors and the public. She is able to respond appropriately to usual work situation and deal with changes in a routine work setting if the instructions are presented simply and unidimensionally.

(AR 578.)

In his Medical Source Statement of Ability to Do Work Related Activities, Dr. Damania noted Plaintiff "would have no difficulty with simple one and two step job instructions in an unskilled setting" but "would have difficulty with complex and detailed instructions." (AR 580.) He noted mild limitations in her ability to make judgments on simple work-related decisions and respond appropriately to usual work situations and to changes in a routine work setting, and moderate difficulties with her ability to understand and remember complex instructions, carry out complex instructions, and ability to make judgments on complex work-related decisions. (AR 580-81.)

//

---

[2] The GAF scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnosis & Statistical Manual of Mental Disorders 32 (4th ed. 2000). The clinician uses a scale of zero to 100 to consider "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness," not including impairments in functioning due to physical or environmental limitations. *Id.* at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

5

### 4.    J. Guyette, FNP, Medical Report

On April 5, 2005, Nurse Practioner Guyette completed a Medical Report, noting she had treated Plaintiff since June of 2002, and reporting Plaintiff suffered from back pain, depression, insomnia, irritable bowel syndrome, gastric hyperlipidemia, and recurrent urinary tract infection. (AR 235.)   She restricted Plaintiff to lifting up to 10 pounds frequently, up to 20 pounds occasionally, and never above 20 pounds.  (AR 236.) She also restricted Plaintiff to carrying up to 10 pounds occasionally, due to Plaintiff's neck and back pain radiating through her extremities. (AR 238.)  Nurse Guyette restricted Plaintiff to sitting for 4 hours total and standing for 3 hours total in an 8-hour workday, one hour at a time, and to walking for 2 hours total in an 8-hour workday.   (AR 239; 513.)   She found no restrictions in Plaintiff's use of her hands or feet (AR 239;  513), limited Plaintiff to occasional balancing and to never climbing, stooping, crouching, kneeling, or crawling due to her dizziness and imbalance, and limited Plaintiff to only occasional reaching and pushing/pulling and to frequent handling and feeling (AR 240; 514).

### 5.    Ekram Michiel, M.D., Psychiatric Evaluation

On September 10, 2010, Dr. Erkram Michiel examined Plaintiff, noting that because she did not speak English and had arrived alone, without a translator, an office employee served as her translator.  (AR 768.)   Plaintiff's chief complaint was that she gets "very nervous" and feels "depressed."  (AR 768.)   She reported feeling nervous since her father was killed in a "family fight" in 1971 and in connection with her abusive first husband, reporting that "sometimes 'out of the blue' her heart goes fast, she is unable to breathe and she feels sweaty and dizzy."  (AR 768.) She reported feeling depressed

> . . . because of my physical condition, I have pain in my legs.  I injured my legs while working in labor work, field work.  I don't sleep good at night, sometimes I don't even have interest in taking a shower.  I cry a lot for no reason.  I am always angry and mad for no reason.  I stay in my room, I lock myself in.  I don't want to talk or do anything."

(AR 768.)  She attempted suicide in 2001 by cutting her wrists, and had taken various medications since that time.  (AR 769.)  Plaintiff was able to take care of her personal hygiene, cook, and do household chores.  (AR 769.)  Plaintiff did not know the name of the current president and was unable to do "simple math calculations.  She did not know how much she would receive if she had

$3.00 and spent $1.20." (AR 770.)

Dr. Michiel diagnosed Plaintiff with Depressive Disorder NOS, leg injury, back injury, and high blood pressure by history, and assigned her a GAF score of 55. (AR 770.) Dr. Michiel opined that Plaintiff "is able to maintain attention and concentration to carry out simple job instructions[;] is able to relate and interact with coworkers, supervisors and the general public[;] [and] is unable to carry out an extensive variety of technical and/or complex instructions." (AR 770.)

In his Medical Source Statement of Ability to Do Work-Related Activities, Dr. Michiel opined that Plaintiff had marked limitations in her ability to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions. (AR 772.)

### 6.   Tony Fernandez, MD, MPH, Internal Medicine Consultative Evaluation and Medical Source Statement of Ability to Do Work Related Activities

An Internal Medicine Consultative Examination by Dr. Tony C. Fernandez, MD, MPH, on March 30, 2011, noted that Plaintiff "lost her medical two years ago" and "[s]he is currently not seeing any provider." (AR 883.) Plaintiff was slow to answer questions at first, but after prompting, became more alert and responsive. (AR 883.) Dr. Fernandez noted Plaintiff's statements about her medical history and limitations:

> She was diagnosed with hypertension six years ago. She was on medications but is recently not taking any, due to lack of insurance. She occasionally experience[s] sharp chest pains. It is non-exertional. No shorthness (*sic*) of breath. She sleeps with two pillows just for comfort for the neck. She states she can sleep on one pillow with no difficulty if she has to.

> She was diagnosed with arthritis three years ago. She would experience upper and lower back pains. She would have constant achy pains that are exacerbated by prolonged sitting and bending. She also experiences pain on the left knee, which is a sharp achy pain and could not walk for a long time. She experiences occasional swelling. No history of any particular injury. No popping or locking.

(AR 883.) She was fairly groomed, walked into the interview with no assistance, and appeared reasonably comfortable. (AR 884.) She was able to get on and off the exam table without difficulty, and could walk more than 50 feet without support or use of assistive devices. (AR 885.) Dr. Fernandez noted a "deep diagonal cut on the distal phalanx of [Plaintiff's] left index finger with some swelling" due to "cutting onions" and a "splash of first degree burn on the

left forearm . . . due to cooking oil." (AR 885.) Plaintiff "was able to produce sustained, audible and understandable speech" during the examination, and Dr. Fernandez opined Plaintiff

> . . . is able to engage in conversational hearing and speech[.] No manipulative limitations to handling, reaching, grasping, fingering and feeling. Grossly normal grip strength for the right hand at 5/5 and 4/5 for the left. [Plaintiff] was able to fully extend the right hand, make fists and appose the fingers. Unable to flex the left index finger, thus weaker with the grip with the left hand. No limitations in lifting, standing, sitting squatting or bending limitations. Can travel by car or bus if necessary. She is physical[ly] able, but would need psychiatric consultative examination for her depression.

(AR 886.)

In an April 10, 2011, Medical Source Statement of Ability to Do Work-Related Activities, Dr. Fernandez opined that Plaintiff could continuously lift or carry up to 20 pounds, could frequently lift or carry up to 50 pounds, and could occasionally lift or carry up to 100 pounds. (AR 887.) He further found that Plaintiff could sit, stand, or walk up to 8 hours at a time without interruption in an 8-hour workday (AR 888), had no limitations in use of her feet (AR 889), could continuously climb stairs or ladders, balance, or stoop, and could occasionally kneel, crouch, or crawl due to her left knee pain (AR 890.) Interestingly, Dr. Fernandez noted that he had not determined Plaintiff's dominant hand in noting that she was limited to occasionally fingering, feeling, and pushing/pulling due to her left index finger laceration. (AR 889.) He concluded that Plaintiff could not engage in "forceful gripping, grasping, or torqueing with the left hand due to possible infected laceration of the left hand." (AR 892.)

**7.    Other Evaluations**

On August 24, 2007, Armyn Carbonell, I.M., opined that Plaintiff's medical problems would restrict her from performing fulltime work above the sedentary level, due to her constant pain in the back of her head, and upper and lower back. (AR 584.) He opined that she could sit for one hour at a time for a total of two hours in an 8-hour day; could stand or walk for two hours at a time for a total of two hours in an 8-hour day; and must lie down or elevate her legs for five hours total in an 8-hour day. (AR 584.)

A Complete Mental Medical Report completed on October 16, 2007, by Danielle Myers, M.D., noted that Plaintiff suffers from depression and anxiety, has a fair response to treatment,

1  and a fair prognosis.  (AR 645.)  A Questionnaire completed by Charles Curry, M.D., on October

2  18, 2007, noted that Plaintiff suffered from pelvic pain, pelvic floor relaxation, and fibroid uterus.

3  (AR 644.)

4       An October 16, 2007, Medical Assessment of Ability to Do Work-Related Activities by

5  Alex Abarca, LCSW, opined that Plaintiff had good ability to follow work rules and function

6  independently;   fair   ability   to   use   judgment,   interact   with   supervisors,   and   maintain

7  attention/concentration; and poor ability to relate to co-workers, deal with the public, and deal

8  with work stress.  (AR 646.)  He rated Plaintiff's ability to understand, remember, and carry out

9  job instructions at all levels of complexity as fair.  (AR 647.)  He rated Plaintiff's ability to

10 maintain personal appearance as good, her ability to demonstrate reliability as fair, and her ability

11 to behave in an emotionally stable manner or relate predictably in social situations as poor.

12 (AR 647.)

13       **8.      Other Medical Records**

14       On February 24, 2002, Plaintiff was admitted to Sierra Kings District Hospital ("Sierra

15 Kings") complaining of rapid respiration, dizziness, and tingling of the extremities.  (AR 573.)  A

16 mammogram taken May 6, 2002, and abdominal and pelvic ultrasounds taken on June 11, 2002,

17 were all normal.  (AR 546; 457.)  On July 20, 2002, Plaintiff was admitted to Sierra Kings

18 complaining of dizziness and stomach pain after inhaling termite poison.  (AR 569.)  On August

19 12, 2002, Plaintiff was admitted to Sierra Kings complaining of a locked jaw; on exam, her

20 chewing muscles did not feel tense, and half an hour after being given a Benadryl she was able to

21 fully open her mouth.  (AR 566-67.)

22       On February 3, 2003, Plaintiff was admitted to Sierra Kings with a urinary tract infection.

23 (AR 556-64.)  On April 10, 2003, Plaintiff was admitted to the Sierra Kings Emergency Room

24 when her "jaw stuck shut" due to "TMJ syndrome."  (AR 548.)  A family member had found her

25 lying on the floor, unable to speak, with a headache lasting approximately two hours.  (AR 550-

26 52.) An April 22, 2003, pelvic ultrasound noted a "large and prominent endometrial echo,

27 measuring at least two cm in thickness and somewhat irregular in shape."  (AR 546.)

28 //

1    Plaintiff was admitted to the Emergency Room at Sierra Kings on November 24, 2003,

2   after ingesting acetaminophen, aspirin, and ethanol, and complaining of mild depression.

3   (AR 342.)  Her husband brought her to the ER after he found her crying, unresponsive, and unable

4   to open her own mouth.  (AR 344.)  After she felt faint and collapsed while at work, Plaintiff was

5   again admitted to the Emergency Room on March 11, 2004, complaining of a headache and near-

6   syncope.  (AR 323-29.)  On May 25, 2004, Plaintiff was first seen by Physical Therapist ("PT")

7   Timothy L. Altomare, after injuring herself when she fell in snow.  (AR 289.)  Although Plaintiff

8   "did not see a physician for approximately 3 days, where she was provided with pain

9   medication[,]" she had been seeing improvements as a result of ongoing treatment with a

10  chiropractor and had been referred to physical therapy due to her ongoing pain.    (AR 289.)

11  Plaintiff was admitted to the Emergency Room at Sierra Kings on June 2 and 22, 2004,

12  complaining of chest pain and pressure.  (AR 313-14; 318-21.)  A June 8, 2014, pelvic and

13  abdominal ultrasound ordered by NP Guyette were unremarkable (AR 316-17.)

14    On July 7, 2004, Plaintiff was seen by Joseph F. Ruda, M.D., for a visual exam.  (AR 310.)

15  Dr. Ruda concluded that Plaintiff had "presbyopia and slight hyperopia, with hyperopic

16  astigmatism" and "suspicious looking asymmetric disks, more cupped on the right than on the

17  left." (AR 310.)   On September 1, 2004, PT Altomare noted that Plaintiff complained of neck

18  pain "related to an injury she sustained two years ago when she fell in the snow hitting her head

19  against a tree."  (AR 283.)  At her follow-up on September 22, 2004, PT Altomare noted that

20  Plaintiff rated her pain as an 8/10 on her initial visit and a 9/10 on her follow-up visit, but had

21  missed three scheduled appointments due to lack of transportation.  (AR 281-82.)

22    April 16, 2004, and February 24, 2005, x-rays of Plaintiff's chest were unremarkable.

23  (AR 322; 428.)   Plaintiff saw Dr. Pentschev on February 7 and 14, 2005, for stomach pain

24  (AR 534; 536), on February 24, 2005, complaining of chest pain, cough, and back pain, and for a

25  follow-up on February 25, 2005, for her cough (AR 523; 525).  A chest x-ray on February 25,

26  2005, was normal.  (AR 526.)  On May 20, 2005, NP Guyette noted Plaintiff complained of body

27  aches, back pain, and stomach pain, and noted Plaintiff had not gotten a prescribed medication

28  although it had been "approved," electing instead to go to the Emergency Room.  (AR 504.)

1       A specimen screening ordered by Dr. Pentschev on May 24, 2005, noted Plaintiff had a

2   history of cervicitis/endocervitis.  (AR 516-17.)  Plaintiff saw Dr. Pentschev on November 15,

3   2004, for chest pain after an argument, and on November 29, 2004, for abdominal pain radiating

4   out to her back and a sore throat.  (AR 538; 541-45.)  An August 25, 2005, CT scan of the pelvis

5   (AR 398), an September 21, 2005, ultrasound of the pelvis (AR 391), and an October 11, 2005,

6   abdominal ultrasound (AR 390) were all normal.   A May 23, 2005, x-ray of the spine was largely

7   normal, with degenerative changes of minimal degree with anterior spur formation seen at the

8   thoracic spine.  (AR 419-20.)  A February 10, 2006, CT scan of Plaintiff's pelvis and abdomen

9   revealed some apparent thickening of the wall linings of her stomach, mild diverticulosis of the

10  colon, heterogeneous appearance of the uterus and mild thickening of the endometrium,

11  atherosclerotic changes in the walls of the abdominal aorta, and mild degenerative changes of the

12  thoracolumbar spine and sacroiliac joints.  (AR 371-72.)

13      Plaintiff was admitted to Sierra Kings Emergency Department on May 18, 2005,

14  complaining of five days of "burning" upper and lower back pain, and was diagnosed with acute

15  lumbar myosfascial strain and prescribed Flexeril.  (AR 506-11.)  Scans of Plaintiff's spine on

16  May 23, 2005, revealed "degenerative changes of minimal degree with anterior spur formation" at

17  the thoracic spine, and normal findings at the cervical spine and lumbosacral spine.  (AR 499-

18  500.)  Plaintiff was readmitted to the Emergency Room on June 9, 2005, in a "catatonic" state

19  after having an argument with her husband (AR 486-90; 494), and again on June 15, 2005, after

20  abruptly "intentionally hit[ting] her head on floor (nonsuicidal)" (AR 480-84).  Plaintiff reported

21  back of head and neck pain, and reported she had been "unable to lift [her] head from lying

22  position" and had been "intentionally hitting back of [her] head against carpeted floor, from

23  emotional upset."  (AR 481.)

24      A mammogram taken January 26, 2006, was normal.  (AR 476.)  A CT scan of the

25  abdomen and pelvis taken February 10, 2006, revealed mild diverticulosis, apparent thickening of

26  the walls of the stomach, mild thickening of the endometrium, small bilateral ovarian cysts,

27  atherosclerotic changes in the walls of the abdominal aorta, and mild degenerative changes of the

28  thoracolumbar spine and sacroiliac joints.  (AR 477-78.)

On May 12, 2006, Plaintiff was admitted to Sierra Kings Emergency Room complaining of a headache, depression, and anxiety.  (AR 469-73.)  Plaintiff cut her right foot on broken glass on May 20, 2006, and when she returned to have the stitches removed, her foot had become infected.  (AR 462-68; 458-60.)  The stiches were removed on June 9, 2006.  (AR 449; 640.)  Plaintiff was seen at the ER again on June 16 and 26, 2006, for the ongoing infection in her right foot, and reported having self-administered penicillin while in Mexico.   (AR 440-48; 450; 455-56.)   On June 20 and 27, 2006, Plaintiff noted overall improvement, but also reported being nervous about putting weight on her right foot.  (AR 627-28.)   On June 26, 2006, Plaintiff reported feeling anxious, feeling "something strange" in her stomach, and noted that after she badly cut her foot with a piece of broken plate, her husband had treated her better.  (AR 925.)  As her foot improved she had begun "to have an ugly feeling and fe[lt] like running away," but was not sure about the basis for the feeling.  (AR 925.)  Notes on June 28, 2006, report that Plaintiff suffered from "severe anxiety" but had not yet started her Klonopin prescription yet.  (AR 626.)

Plaintiff complained of muscle spasms in her neck on August 4, 2006 (AR 624), and reported being in a "solo car accident in the snow about 2 years ago" when "she hit a tree" (AR 623).  Plaintiff appears to have treated with Dr. Raymon Raypon, M.D., on several occasions, including May 3, June 26, July 5, and August 23, 2006, but these progress notes are almost entirely illegible.  (AR 658-60; 663.)  Imaging of the cervical spine, following complaint of a headache, was normal on September 14, 2006.  (AR 620-21.)  On September 20, 2006, Plaintiff was noted as diagnosed with "Major Depressive" disorder, "recurrent unspecified."  (AR 656.)  On October 11, 2006, Plaintiff was noted not to have filled her prescriptions (AR 617), on October 18, 2006, Plaintiff reported "feeling better" (AR 654), and on December 13, 2006, Plaintiff reported suffering from spontaneous crying spells and feeling depressed (AR 652).

Plaintiff complained of "burning pain" in her abdomen on January 12, 2007 (AR 610), and stomach and chest pain on January 31, 2007 (AR 609).  On January 30, 2007, Plaintiff complained of neck pain and upper back muscle spasms due to having her "head bent over for hours while working."  (AR 591.)  A February 16, 2007, upper abdominal ultrasound, including renal system, was normal (AR 608), and a March 2, 2007, pelvic ultrasound revealed a heterogeneous,

anteverted uterus, and a possible 2.2 x 1.5 c.m. hyperechoic structure in the uterus (AR 606).  A scan of the right foot taken March 11, 2007, revealed a mild hallux valgus and a plantar calcaneal spur, but no evidence of acute fracture or dislocation were noted.  (AR 604.)  A scan of the right foot taken on March 21, 2007, revealed "no definite evidence of fracture and/or area of dislocation," some bunion deformity and hammertoe deformities, a moderately large heel spur, and "some soft tissue swelling dorsally over the level of the metatarsals."  (AR 602.)  On March 23, 2007, Plaintiff was seen for a surgical pathology consultation to take a specimen of gastric polyps; no active ulcer was identified.  (AR 600.)  Though Plaintiff complained her foot was not improving when she was seen on March 22, 2007, she reported improvement on March 24, 2007. (AR 599.)

On August 11, 2007, a scan of the lumbosacral spine revealed "[s]ome slight scoliosis with convexity toward the right," "[m]ild to moderate degenerative changes throughout the entire lumbar region," suspect components of disk disease at the mid and lower levels, and possible spinal stenosis at the mid and lower levels.  (AR 590.)  On August 15, 2007, Plaintiff complained of low back pain (AR 589), and on August 16, 2007, a spinal scan revealed "minimal early degenerative changes" to Plaintiff's cervical spine, "[s]ome slight scoliosis, with convexity toward the right," and "mild to moderate to moderately severe degenerative changes" to Plaintiff's thoracic spine (AR 588).  On August 22 and 24, 2007, Plaintiff reported she was unable to work in a packing house due to one and a half months of constant neck and upper back pain.  (AR 586-87.) On September 25, 2007, Plaintiff was seen for pelvic pain and possible urinary tract infection (AR 585), and a lab report noted the presence of endocervical and/or metaplastic cells but was negative for intraepithelial lesion or malignancy (AR 667).

An October 2, 2007, MRI of Plaintiff's thoracic spine revealed mild to moderate degenerative changes of the thoracic spine, with multilevel degenerative disk disease and facet arthropathy.  (AR 879.)  An MRI of the lumbar spine taken that same day revealed slight grade 1 spondylolisthesis at the L5-S1 level, mild to moderate degenerative changes of the lumbosacral spine with milutilvel disk disease and facet arthropathy, mild posterior and posterolateral disk bulging at L4-5, and L5-S1, and mild to moderate degenerative changes of the sacroiliac joints.

1    (AR 880-81.)

2        A March 24, 2008, abdominal ultrasound was largely normal, with a slightly dialated bile

3    duct and slightly thickened gallbladder wall surrounded by fluid, suggesting cholecystitis or

4    acalculous cholecystitis.  (AR 871.)  Plaintiff complained of neck pain in August, September, and

5    October 2008 (AR 842, 844, 848-49, 857), pain in her right side and spasms in her lower back on

6    October 10 and 28, 2008 (AR 837, 840), pain in her back, leg, and pelvis on August 10, 2009

7    (AR 823), and trouble sleeping during an office visit on August 26, 2009 (AR 822).  Imaging of

8    Plaintiff's left foot taken on August 25, 2008, revealed a sharp calcaneal spur but no evidence of

9    acute fracture or dislocation.  (AR 856.)  CT scans of Plaintiff's head taken on August 28, 2008,

10   and May 23, 2009, were normal.  (AR 829; 851-52.)  A reproductive tract specimen taken on

11   September 14, 2009, and mammograms taken on October 22, 2007, October 23, 2009, October 26,

12   2009 and November 11, 2009, showed no indication of malignancy (AR 803; 805; 815-16; 839;

13   878.)  An April 26, 2010, left knee x-ray revealed small joint effusion.  (AR 787.)

14       Plaintiff was admitted to Community Regional Medical Center behavioral health

15   department on April 5, 2011, "on a 5150 as danger to self and gravely disabled.  [She] had

16   complained of a 15 day history of increasing depression with poor sleep, poor appetite, poor

17   grooming and constantly crying."  (AR 933.)  She was assessed as having a GAF score of 50, and

18   discharged to stay with her daughter on April 12, 2011.  (AR 933.)

19       Alexander Betancourt, Licensed Marriage and Family Therapist, noted on April 21, 2011,

20   Plaintiff was "at CBHC for 9 days because she was suicidal" and was released on April 13, 2011.

21   (AR 896.)  He further noted Plaintiff "is depressed and anxious daily for most of the day for the

22   last 10 years getting worse in the last 2 years."  (AR 905.)  On May 12, 2011, Plaintiff was

23   admitted to the Urgent Care Wellness Center, complaining of trouble sleeping, fatigue, and

24   depression, and reported having been separated from her husband since her last hospital

25   admission.  (AR 893.)  Comments note "[q]uestionable motivation in treatment given that she

26   dropped out of treatment in 2008.  She claims she did not have medical however no notes in

27   record indicating she had repeatedly tried to continue services."  (AR 895.)

28   //

14

1    On June 11, 2011, Plaintiff complained of aches and pains and ongoing depression, and

2    complaining that her last three visits to the Emergency Room had "resulted in bills which she

3    cannot afford." (AR 891.) She reported taking aspirin and using her husband's Klonopin and pain

4    medications. (AR 891.) In all progress notes, Plaintiff was noted to need an interpreter to speak.

5    On October 19, 2011, Plaintiff was seen for her depression/anxiety at Turning Point of Central

6    California, where she reported being stable until she suffered physical abuse from her first

7    husband and verbal abuse from her second husband. (AR 952.)

8    **B.    Written Reports**

9    On May 12, 2004, Plaintiff applied for benefits, alleging depression beginning in May of

10   2001. (AR 179.) In an Adult Disability Report filled out on May 14, 2004, she stated that she

11   could not speak English, only Spanish, and provided contact information for her daughter, who

12   could communicate in English. (AR 187.) Plaintiff described her "illnesses, injuries or

13   conditions" limiting her ability to work as "depression, fall asleep at any time for no reason, [and]

14   suicide" and noted that she "could not do field labor anymore." (AR 188.) Plaintiff stated that

15   due to her impairments, she had begun working fewer hours "because, I'd started feeling worse,

16   and at work I didn't finish the season, I left my job on September because I wasn't doing ok; w/

17   myself, I'd never told them anything, because I thought that they'll deny me work, and I need it to

18   work, but more and more my problem worsen, dizz[i]ness, headache, depression pain etc."

19   (AR 188.) Plaintiff also noted that she had become entirely unable to work as of November 30,

20   2003 "because [she] didn't feel well." (AR 188.) She never, however, lost a job as a result of her

21   condition "because [she] never told them anything about [her] conditions, because if [she] told

22   them that they would not give [her] the job. So whenever [she] felt sick or unable to work or

23   depressed [she] just simply didn't go." (AR 207.)

24   Plaintiff described her past relevant work as a "fruit packer" as "stay[ing] standing up

25   mostly all day" and repeatedly "reach[ing] for fruit from belt, placed on box, [and] carried box 5-

26   10 ft." (AR 189.) In this job, she had to kneel 8 hours, sit ½ hour, and climb 1 hour total each

27   day. (AR 189.) This section appears to have been filled in by two different individuals based on

28   the change in handwriting, and it is unclear who actually completed the form. (AR 189.)

1    In a Daily Activities Questionnaire completed on June 21, 2004, Plaintiff stated that on an

2  average day she will "[g]et up bathe, do my chores, such as my laundry, if I feel good I can cook

3  dinner, clean the house a little and w/ the help of my family, daughter & son, one, [unreadable],

4  takes the trash outside to the can.  They all help me along."  (AR 203.)  Plaintiff states that she is

5  unable to "sleep all night because of [her] depression even when [she] take[s] her sleeping pills."

6  (AR 203.)  While she "still can groom, dress, and clean" herself, she generally "[does]n't feel like

7  doing anything including, getting dress[ed], do[ing] [her] hair, because [she] always feel[s]

8  depressed."  (AR 203.)  Plaintiff still cooks 2-3 times a week, goes grocery shopping once a week,

9  and waters her garden and plants flowers.  (AR 204; 206.)  She goes "to the park to visit [her]

10  mother and brothers," and when she feels "like walking, [she] go[es] walking."  (AR 205.)  She

11  participates in her church, attending four days a week, but only goes when accompanied by her

12  husband.  (AR 206.)

13    Plaintiff reported she has trouble concentrating, noting that "sometimes, it happens that

14  they are talking to me or we are having a conversation and I just can't focus or concentrate, like [I]

15  am there but my mind is somewhere else that I don't know."  (AR 207.)  However, she does not

16  "have a lot of difficulty" in following written or verbal instructions, noting that "the only problem

17  is that [she] forget[s] which one is first concerning cooking."  (AR 207.)

18    Plaintiff's daughter completed a Third Party Function Report in the first-person as though

19  Plaintiff had completed the form.  In addition to recounting nearly verbatim Plaintiff's own report,

20  it is unclear which statements are Plaintiff's and which are her daughter's alone.  (*See* AR 210-18.)

21  Regardless, Plaintiff's daughter noted Plaintiff has no issues with personal care (AR 211) and

22  follows verbal instructions better than written instructions (AR 215).

23    In the field office Disability Report, Plaintiff was noted to have trouble answering

24  questions while speaking through a translator, and "every time she was asked a question she

25  hesitated and just sat there with a blank stare until the question was asked of her again and

26  repeated in several different ways.  (AR 201.)

27  //

28  //

16

**C.    Hearing Testimony**

A hearing on February 24, 2011, was continued because Plaintiff had failed to appear for two scheduled appointments with an agency consultative physician.  (AR 964-77.)  During the hearing on October 20, 2011, Plaintiff was represented by counsel and a translator was present.  (AR 980-1017.)

The ALJ posed two hypotheticals to the VE involving Plaintiff's mental limitations and physical limitations.    In the first hypothetical, the ALJ presented a person "the same age, education, language, and experience background" as the Plaintiff, and

> . . . able to maintain attention, and concentration, and carry out simple job instruction, is able to relate and interact with coworkers, supervisors, and the public, Is unable to carry out an extensive variety of technical and/or complex instructions.  Indeed, this person would be markedly limited in the ability to understand and remember complex instructions, carry out complex instructions, or make judgments on complex work related decisions.

(AR 1004-05.)  The VE testified that such a person could perform Plaintiff's past relevant work, as well as all unskilled work at all exertional levels.  (AR 1004-05.)

In the sixth hypothetical, the ALJ presented a claimant

> . . . able to engage in conversational hearing and speech, no manipulative limitations on handling, reaching, grasping, fingering, or feeling.  No limitations in lifting, standing, sitting, squatting, or bending.  Can travel by bus or car, but then lift and carry up to 20 pounds continuously, up to 50 pounds frequently, up to 100 pounds occasionally, can stand eight hours at a time for eight hours in the aggregate, sit eight hours at a time for eight hours in the aggregate, and walk for eight hours at a time for eight hours in the aggregate.  And then reaching, handling, fingering, and feeling are all at constant, can continuously operate foot controls, can continuously climb stairs, ladders, scaffolds, balance, and stoop, can occasionally kneel, crouch, and crawl.  No limitations on unprotected heights, moving machinery, motor vehicles, humidity or wetness, dust, fumes, cold, heat, vibration.  This person can additionally – is able to perform activities like shopping, travel without assistance, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb some stairs without – climb a few stairs at a reasonable pace with the use of a handrail, can prepare simple meals and feed herself, can care for personal hygiene, can sort, handle, and use paper files.  This person should avoid forceful gripping and grasping with the left hand, and, as mentioned, she is right hand dominant.

(AR 1009-11.)  The VE testified that such a person could perform Plaintiff's past relevant work, as well as alternative work in food prep, as a cafeteria attendant, and as a hand packager.

1    (AR 10011.)

2    **D.      Administrative Proceedings**

3         On September 15, 2006, the ALJ issued a decision and determined Plaintiff was not

4    disabled.  (AR 113-19.)   The ALJ found that Plaintiff had a severe impairment of a depressive

5    disorder, but did not have an impairment or combination of impairments meeting or equaling a

6    listed impairment. (AR 115-16.)  The ALJ found Plaintiff retained the residual functional capacity

7    ("RFC") "to perform simple, repetitive tasks."  (AR 116.)  Given this RFC, the ALJ found that

8    Plaintiff was able to perform her past relevant work as a farm worker and as a packer.  (AR 118.)

9    The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from

10   May 12, 2004, the date the application was filed, to the date of the decision.  (AR 118.)  Plaintiff

11   appealed to the Appeals Council, which reviewed and remanded the case back to the ALJ for

12   further development of the record.  (AR 124-25.)

13        On December 28, 2007, the ALJ issued a second decision, again finding Plaintiff was not

14   disabled.  (AR 17-25.)   The ALJ found that Plaintiff had a severe impairment of a depressive

15   disorder (AR 19), but did not have an impairment or combination of impairments meeting or

16   equaling a listed impairment (AR 20-21).  The ALJ again found Plaintiff retained the RFC "to

17   perform simple repetitive tasks."  (AR 116.)   The ALJ determined that Plaintiff was able to

18   perform past relevant work as a farm worker and a packer, and that this work "does not require the

19   performance of work-related activities precluded by the claimant's [RFC]."  (AR 24.)  The ALJ

20   therefore concluded that Plaintiff was not disabled, as defined in the Social Security Act, from

21   May 12, 2004, the date the application was filed, to the date of the decision.  (AR 24.)  Plaintiff

22   appealed to the Appeals Council, which denied review, and then sought judicial review in the

23   District Court.  (Doc. 15, 5.)  The parties stipulated to remand to the ALJ for further proceedings.

24   (AR 705-06.)

25        On November 3, 2011, the ALJ issued a third decision, again finding Plaintiff was not

26   disabled.  (AR 692-703.)  The ALJ found that Plaintiff had severe impairments of arthritis and

27   degenerative disc disease of the spine, history of laceration of the left hand with possible infection,

28   and depressive disorder, but did not have an impairment or combination of impairments meeting

or equaling a listed impairment.  (AR 694-95.)  The ALJ determined that Plaintiff retained the RFC

> . . . to lift and carry 100 pounds occasionally, 50 pounds frequently, and 20 pounds continuously.  She can stand and/or walk eight hours and sit eight-hours in an eight-hour workday; occasionally kneel, crouch, and crawl; and must avoid forceful gripping, grasping, and torqueing with the left hand.  Mentally, claimant is able to maintain attention and concentration to carry out simple job instructions, as well as relate to and interact with coworkers, supervisors, and the general public.  However, she is unable to carry out an extensive variety of technical and/or complex instructions (20 CFR 416.967(c)).

(AR 696.)  The ALJ determined Plaintiff was able to perform her past relevant work as a farm worker and a packer as this work "does not require the performance of work-related activities precluded by the claimant's [RFC]."  (AR 701.)  The ALJ further found Plaintiff could perform the requirements of other jobs such as food prep worker, café attendant, and hand packager.  (AR 703.)  The ALJ therefore concluded Plaintiff was not disabled, as defined in the Social Security Act, from May 12, 2004, the date the application was filed, to the date of the decision.  (AR 703.)  This decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on June 7, 2013.  (AR 668-71.)

**E.     Plaintiff's Complaint**

On August 8, 2013, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues that the ALJ erroneously relied on the Vocational Expert's testimony and failed to provide legally sufficient reasons for rejecting Nurse Guyette's opinion.   (Docs. 15; 17.)   Plaintiff contends that the case must be remanded for further development of the record regardless of whether Nurse Guyette's records are fully credited, because the Vocational Expert's testimony is not substantial evidence sufficient to support a disability determination.

### III.    SCOPE OF REVIEW

The Commissioner's decision that a claimant is not disabled will be upheld by a district court if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied.  42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v.*

1   *Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Davis v. Heckler*, 868 F.2d

2   323, 325 (9th Cir. 1989); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Tidwell v. Apfel*,

3   161 F.3d 599, 601 (9th Cir. 1999); *Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985) (the

4   findings of the Commissioner as to *any* fact, if supported by substantial evidence, are conclusive.)

5   Substantial evidence is more than a mere scintilla, but less than a preponderance. *Ryan v. Comm'r*

6   *of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Saelee v. Chater*, 94 F.3d 520, 521

7   (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to

8   support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison*

9   *Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

10         "While inferences from the record can constitute substantial evidence, only those

11   'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066

12   (9th Cir. 2006) (citation omitted); *see also Desrosiers v. Sec'y of Health and Hum. Servs.*, 846

13   F.2d 573, 576 (9th Cir. 1988) (the Court must review the record as a whole, "weighing both the

14   evidence that supports and the evidence that detracts from the [Commissioner's] conclusion.")

15   The Court "must consider the entire record as a whole, weighing both the evidence that supports

16   and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by

17   isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

18   (9th Cir. 2007) (citation and internal quotation marks omitted).

19         The role of the Court is *not* to substitute its discretion in the place of the ALJ – "[t]he ALJ

20   is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

21   ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted);

22   *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). "Where the evidence is susceptible to more

23   than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion

24   must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002); *Andrews v. Shalala*, 53

25   F.3d 1035, 1041 (9th Cir. 1995); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (the

26   court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ

27   on a ground upon which he did not rely."); *see Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th

28   Cir. 1987) (if substantial evidence supports the administrative findings, or if there is conflicting

1  evidence supporting a particular finding, the finding of the Commissioner is conclusive).   The

2  court will not reverse the Commissioner's decision if it is based on harmless error, which exists

3  only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate

4  nondisability determination.'"   *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)

5  (quoting *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *see also Burch v. Barnhart*, 400

6  F.3d 676, 679 (9th Cir. 2005).

7                                    **IV.   APPLICABLE LAW**

8           An individual is considered disabled for purposes of disability benefits if he is unable to

9  engage in any substantial, gainful activity by reason of any medically determinable physical or

10  mental impairment that can be expected to result in death or that has lasted, or can be expected to

11  last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

12  1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

13  impairments must result from anatomical, physiological, or psychological abnormalities that are

14  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

15  such severity that the claimant is not only unable to do his previous work, but cannot, considering

16  his age, education, and work experience, engage in any other kind of substantial, gainful work that

17  exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

18           The regulations provide that the ALJ must undertake a specific five-step sequential

19  analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the

20  claimant is currently engaged in substantial gainful activity.     20 C.F.R. §§ 404.1520(b),

21  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

22  impairment or a combination of impairments significantly limiting her from performing basic

23  work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines

24  whether the claimant has a severe impairment or combination of impairments that meet or equal

25  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is

26  therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must

27  determine whether the claimant has sufficient RFC to perform her past work despite the

28  impairment or various limitations.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden

shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.   DISCUSSION

Plaintiff argues that the ALJ failed to present a hypothetical to the VE that synthesized Plaintiff's physical and mental limitations and instead erroneously presented two separate hypotheticals dividing physical and mental limitations, failed to include Plaintiff's illiteracy in his finding she could perform her past relevant work, failed to elicit an explanation for the VE's deviation from the Dictionary of Occupational Titles ("DOT"), and failed to provide legally sufficient reasons for rejecting Nurse Guyette's opinion.

**A.   The ALJ Erroneously Relied on the VE's Testimony in Finding Plaintiff Not Disabled**

**1.   The ALJ Erroneously Relied on the VE's Testimony Plaintiff Could Perform her Past Relevant Work**

Plaintiff argues the VE's testimony that Plaintiff could perform her past relevant work as generally and actually performed did not comport with the DOT, and the ALJ failed to provide a reasonable explanation for the deviation in his decision.  (Doc. 15, 14.)  Plaintiff further argues the ALJ failed to properly include Plaintiff's illiteracy into his finding that she was capable of performing her past relevant work.  (Doc. 15, 15-16.)  The Commissioner contends that any conflicts between the DOT and the VE testimony were harmless because Plaintiff retained the capacity to perform her past relevant work as she had actually performed it.  (Doc. 16, 7-8.)

**a.   Legal Standard**

In determining whether appropriate jobs exist for the claimant, the ALJ generally will refer to the DOT.  *Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).  The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony, particularly in cases where the expert's testimony conflicts with the DOT.  In making disability determinations, the ALJ may rely on VE testimony that contradicts the DOT,

1   but only insofar as the record contains persuasive evidence to support the deviation. *Light*, 119

2   F.3d at 793; *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995); *Massachi v. Astrue*, 486

3   F.3d 1149, 1153 (9th Cir. 2007).   Although evidence provided by a VE "generally should be

4   consistent" with the DOT, "[n]either the DOT nor the VE . . . evidence automatically 'trumps'

5   when there is a conflict." SSR 00-4p at *2.  Thus, the ALJ must first determine whether a conflict

6   exists, and if it does, must then determine whether the VE's explanation for the conflict is

7   reasonable and whether a basis exists for relying on the expert rather than the DOT.  *Id.* at *2-3.

8   Failure to do so requires reversal unless the error was harmless, i.e., there was no actual or

9   apparent conflict or the vocational expert provided sufficient support for her conclusion so as to

10  explain away any conflicts. *Johnson*, 60 F.3d at 1435; *Coleman v. Astrue*, 423 Fed. App'x 754,

11  756 (9th Cir. 2011) (unpublished); *Massachi*, 486 F.3d at 1154, n.19.

12       Only after determining whether the VE has deviated from the DOT, and whether any

13  deviation is reasonable, can an ALJ properly rely on the VE's testimony as substantial evidence to

14  support a disability determination.  *Massachi*, 486 F.3d at 1152-54.  Evidence sufficient to support

15  a deviation from the DOT may be either specific findings of fact regarding plaintiff's ability to

16  perform particular jobs, or inferences drawn from the context of the expert's testimony.  *See Light*,

17  *supra* at 1435 n.7 (ALJ provided sufficient support for deviation by noting that the VE described

18  characteristics and requirements of jobs in the local area consistent with claimant's RFC); *Terry v.*

19  *Sullivan*, 903 F.2d 1273, 1279 (9th Cir. 1990) (ALJ may infer support for deviation where VE's

20  understanding of applicable legal standards is clear from context).

21              **b.    It is Unclear whether the VE's Testimony Regarding Work Plaintiff**
               **Could Perform Despite Her Restriction from Forceful Gripping,**
22             **Grasping, or Torquing was Consistent with the DOT**

23       SSR 00-4p explicitly requires that the ALJ determine whether the expert's testimony

24  deviates from the DOT, and whether there is a reasonable explanation for any deviation.  At the

25  hearing, the ALJ did not ask whether the VE's opinions were consistent with the DOT, and, if so,

26  whether there was a reasonable explanation for the conflict.  Although the VE was not providing

27  evidence about the "requirements of a job" by stating Plaintiff was qualified for certain jobs in

28  response to the ALJ's hypothetical question, the VE was indirectly providing such evidence.  *See*

1  SSR 00-4p at *4 (stating that an ALJ must inquire whether a VE's testimony regarding "the

2  requirements of a job or occupation" conflicts with the DOT).

3      Unless the VE's testimony actually conflicts with the DOT, by itself the ALJ's failure to

4  explicitly ask whether the VE's testimony was consistent with the DOT is not enough to warrant

5  reversal. *Massachi*, 486 F.3d at 1151 n.19, 1152-53 (failure to ask whether the VE's testimony is

6  consistent with the DOT is harmless procedural error where there is no actual conflict, or the VE

7  has provided sufficient support for her conclusion so as to justify any potential conflicts).

8      Many courts considering Plaintiff's argument have concluded that "[h]andling" is not

9  synonymous or interchangeable with "forceful gripping and grasping." *See, e.g., Robles v. Colvin*,

10  No. 1:14-cv-00285-SMS, 2014 WL 7447764 at *7 (E.D. Cal. Dec. 31, 2014); *Suarez v. Astrue*,

11  No ED CV 11-1940-SP, 2012 WL 4848732 at *4 (C.D. Cal. Oct. 11, 2012) ("neither handling nor

12  fingering require forceful gripping or grasping[.]"); *Czajka v. Astrue*, No CACV 09-00914-MAN,

13  2010 WL 3293350 at *4 (C.D. Cal. Aug. 18, 2010) ("The act of grasping requires a firm hold or

14  grip.  Handling can mean simply touching or using the hands.  It is improper to conflate the two

15  terms."); *Equihua v. Astrue*, No. EDCV 10-0122-JEM, 2011 WL 321993 at *6 (C.D. Cal. Jan. 28,

16  2011) ("Frequent handling is not the same as 'forceful' handling."); *Dixon v. Astrue*, No. C-07-

17  03370-JCS, 2008 WL 3984594 at * 11 (N.D. Cal. Aug. 27, 2008) (claimant was capable using her

18  non-dominant hand for "frequent but not constant handling and fingering, and only occasional

19  forceful gripping and grasping"). Here, the ALJ clarified the restriction from forceful gripping,

20  grasping, and torqueing would not affect a worker's ability to perform "normal" handling and

21  fingering.  (AR 1011.)  Thus, jobs that require frequent fingering or handling do not present any

22  apparent conflict with a limitation from forceful gripping, grasping, or torqueing.

23      Nonetheless, an issue remains with the VE's testimony about Plaintiff's past relevant

24  work.  The VE characterized Plaintiff's past relevant work as "farm laborer," but offered no

25  corresponding DOT number, and the DOT does not contain this precise job category.  The DOT

26  contains listings for a variety of jobs characterized as "farm workers" – which appear close to

27  "farm laborer" – but it is not clear whether this is the job category the VE considered in providing

28  testimony.  The VE testified that "farm laborer" was considered unskilled and considered at a

1   medium exertional level pursuant to the DOT (AR 1003), but as Plaintiff notes, some of the

2   listings under "farm laborer" are considered in the "heavy" exertional category.  The Court is

3   unable to determine which particular title within the farm laborer category the VE was referring to

4   when giving testimony.

5          The DOT job descriptions of Plaintiff's past work that appear to be closest to those the VE

6   identified (*see* DOT 920.687-134 (agricultural packer); 421.687-010 (Farmworker, General II)) do

7   not include physical task components of grasping, gripping, or torqueing.  In fact, it appears that

8   no DOT job has a separate physical task component delinated as grasping, gripping, or torqueing.

9   Although the Court is not persuaded that – as clarified by the ALJ to the VE – a limitation from

10  any forceful grasping, gripping, or torqueing with the left hand is inconsistent with a job requiring

11  any degree of handling and fingering, this issue shall be given renewed consideration.  As

12  discussed below, this case must be remanded for additional VE testimony in any event.  To

13  adequately address the issue of Plaintiff's past relevant work, on remand the VE should testify

14  what DOT numbers specifically accompany those DOT jobs the VE identified as representative of

15  Plaintiff's past relevant work.  The ALJ should also ask the VE whether any limitations on

16  forceful gripping, grasping, or torqueing with the left hand would be inconsistent with Plaintiff's

17  past relevant work or alternative work requiring any degree of handling or fingering.

18          **c.    The VE's Testimony is Inconsistent with the Language Level**
          **Requirements of the DOT, and No Reasonable Explanation for the**
19          **Conflict was Offered**

20          Plaintiff argues the ALJ failed "to clarify how Plaintiff's language and literacy abilities

21  factored into his analysis that Plaintiff could perform her past relevant work." (Doc. 15, 15-16.)

22  The ALJ did not include any reference to Plaintiff's inability to speak English in his hypotheticals

23  to the VE during the hearing, and aside from mentioning that Plaintiff must be "considered in the

24  same way as an individual who is illiterate in English," the ALJ did not address Plaintiff's inability

25  to speak English in his decision.  (AR 702.)  Neither the ALJ nor the VE addressed the impact of

26  Plaintiff's illiteracy on her ability to find and perform her past relevant work or another medium,

27  unskilled job.

28  //

1    While a claimant is not per se disabled if he or she is illiterate, the ALJ must "definitively

2 explain" the impact of a claimant's illiteracy on her ability to find and perform either past relevant

3 work or other work. *Pinto v. Massanari*, 249 F.3d 840, 848 (9th Cir. 2001).  The ALJ did not

4 address Plaintiff's illiteracy at Step 4, but found Plaintiff capable of performing her past relevant

5 work.  (AR 701.)   Although the VE's testimony is vague as to the specific DOT job title that

6 encompassed Plaintiff's past relevant work, DOT sections 920.687-134 (agricultural produce

7 packer) and 421.687-010 (farmworker) appear to be closest (*see* AR 1003-04), and they each

8 require a Language Level of 1.   Although it is reasonable to assume that if Plaintiff has

9 demonstrated an ability to perform this work in the past despite her lack of English language skills,

10 she should be able to perform that same work in the future, the impact of Plaintiff's illiteracy on

11 her ability to perform her past relevant work as actually performed was not given express

12 consideration by the ALJ or the VE.  The Court may review only the reasons stated by the ALJ in

13 his decision "and may not affirm the ALJ on a ground upon which he did not rely."  *Orn*, 495 F.3d

14 at 630.   Because the VE did not specify particular DOT numbers and the job titles that do not

15 translate precisely to jobs identified in the DOT, it is only an assumption that Plaintiff's inability to

16 speak English does not impact her ability to perform her past relevant work and that assumption is

17 not sufficient to conclude that any failure to expressly consider Plaintiff's literacy was harmless.

18    Further, despite noting at Step 5 that Plaintiff "is not able to communicate in English, and

19 is considered in the same way as an individual who is illiterate in English[,]" the ALJ determined

20 that Plaintiff could perform other work.  (AR 702-03.)  According to the DOT sections 920.587-

21 018 (hand packager, any industry); 319.484-010 (food assembler); 311.677-010 (cafeteria worker)

22 – sections closest to those described by the VE during the hearing – these "representative

23 occupations" which Plaintiff can perform all require a Language Level of 1.  Language Level 1

24 requires that a person have the following skills:

25    Reading:       Recognize meaning of 2,500 (two- or three-syllable) words.  Read at a rate
26                of 95-120 words per minute.  Compare similarities and differences between
             words and series of numbers.

27    Writing:        Print simple sentences containing subject, verb, and object, and series of
             numbers, names, and addresses.

28

1    Speaking:        Speak simple sentences, using normal word order, and present and past
                     tenses.

2    *See* 920.587-018; 319.484-010; 311.677-010.

3        "The ability to communicate is an important skill to be considered when determining what

4    jobs are available to a claimant.  Illiteracy seriously impacts an individual's ability to perform

5    work-related functions such as understanding and following instructions, communicating in the

6    workplace, and responding appropriately to supervision."  *Pinto*, 249 F.3d at 846; *see also*

7    20 C.F.R. § 416.695(b)(5) ("[W]e consider a person's ability to communicate in English when we

8    evaluate what work, if any, he or she can do.").  An ALJ's failure to explain how a plaintiff's

9    illiteracy limitation related to his finding that the plaintiff could perform her past relevant work as

10   generally performed is reversible error.  *Pinto*, 249 F.3d at 847.

11       Here, the ALJ neither expressly included Plaintiff's illiteracy as a limitation in his

12   hypotheticals to the VE – though he did ask the VE to consider Plaintiff's "education" and

13   "language" – nor did he address Plaintiff's illiteracy in his decision.  (AR 701-03; 1004-11.)  In

14   fact, in hypothetical six, the ALJ specifically asked the VE to consider a person capable of

15   engaging "in conversational hearing and speech" (AR 1009), directly contradicting Plaintiff's

16   illiteracy.  The VE failed to explain the impact of Plaintiff's illiteracy on her ability to perform

17   her past work and failed to account for the deviation from the Language Level 1 requirement set

18   forth in the DOT descriptions of Plaintiff's past relevant work.  The fact that Plaintiff previously

19   performed such work without being literate in English is neither sufficient nor persuasive

20   evidence to support a deviation from the DOT requirement.  Although a plaintiff "is not per se

21   disabled if he or she is illiterate," the ALJ's failure to provide a reasonable explanation for his

22   deviation from the DOT's language requirements to find Plaintiff capable of performing her past

23   relevant work and the alternative work identified is erroneous.  *Pinto*, 249 F.3d at 847.

24       Further, the ALJ failed to discuss Plaintiff's literacy in his decision.  It is not clear from the

25   ALJ's decision whether the fact that Plaintiff "is not able to communicate in English" impairs her

26   ability to perform medium, unskilled work in any of the "representative occupations" the ALJ lists.

27   *See Mui Si Voong v. Astrue*, 641 F.Supp.2d 996, (E.D. Cal. 2009) (remanding the case for further

28   consideration because the hypothetical relied upon by the ALJ did not account for plaintiff's need

for an interpreter to explain instruction on how to perform one- to three-step commands).  Because the ALJ made very few findings and relied largely on the conclusions of the VE, it is difficult for this Court to review the decision.  As the Ninth Circuit has repeatedly stated, "requiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review.  When . . . the ALJ makes findings only about the [Plaintiff]'s limitations, and the remainder of the step four assessment takes place in the [VE's] head, we are left with nothing to review." *Pinto*, 249 F.3d at 847 (internal quotation omitted).

Based on the foregoing, the VE's testimony that Plaintiff can perform her past relevant and alternative work conflicts with the DOT Language Level requirements of those jobs, and the ALJ's finding that Plaintiff can perform her past relevant work or any alternative work is not supported by substantial evidence.

### 2.   The ALJ Failed to Present a Complete Hypothetical to the VE Incorporating All of Plaintiff's Medically Substantiated Limitations

Plaintiff further argues the ALJ failed to pose a hypothetical to the VE that synthesized all of the mental and physical limitations contained in Plaintiff's RFC into a single hypothetical. (Doc. 15, 13.)  The VE posed six consecutive hypotheticals to the VE, and ultimately adopted an RFC based on a combination of hypothetical one, which contained the mental limitations opined to by Dr. Ekram Michel, and hypothetical six, which contained the physical limitations opined to by Dr. Fernandez.  (Doc. 15, 13.)  The Commissioner contends the ALJ did not need to present an additional hypothetical combining these limitations.  (Doc. 16, 6-7.)

A hypothetical question posed to the VE must set out all the substantial, supported limitations and restrictions of the particular claimant.  *See Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  It may exclude those alleged limitations the ALJ finds do not exist based on substantial evidence, *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001), but if a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  *See DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the

evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  *See Embry*, 849 F.2d at 422-23.

The ALJ posed two hypotheticals to the VE involving Plaintiff's mental limitations and physical limitations.    In the first hypothetical, the ALJ presented a person "the same age, education, language, and experience background" as the Plaintiff, and

> . . . able to maintain attention, and concentration, and carry out simple job instruction, is able to relate and interact with coworkers, supervisors, and the public, Is unable to carry out an extensive variety of technical and/or complex instructions.    Indeed, this person would be markedly limited in the ability to understand and remember complex instructions, carry out complex instructions, or make judgments on complex work related decisions.

(AR 1004-05.)  The VE testified that such a person could perform Plaintiff's past relevant work, as well as all unskilled work at all exertional levels.  (AR 1004-05.)

In the sixth hypothetical, the ALJ presented a claimant

> . . . able to engage in conversational hearing and speech, no manipulative limitations on handling, reaching, grasping, fingering, or feeling.  No limitations in lifting, standing, sitting, squatting, or bending.  Can travel by bus or car, but then lift and carry up to 20 pounds continuously, up to 50 pounds frequently, up to 100 pounds occasionally, can stand eight hours at a time for eight hours in the aggregate, sit eight hours at a time for eight hours in the aggregate, and walk for eight hours at a time for eight hours in the aggregate.  And then reaching, handling, fingering, and feeling are all at constant, can continuously operate foot controls, can continuously climb stairs, ladders, scaffolds, balance, and stoop, can occasionally kneel, crouch, and crawl.  No limitations on unprotected heights, moving machinery, motor vehicles, humidity or wetness, dust, fumes, cold, heat, vibration.    This person can additionally – is able to perform activities like shopping, travel without assistance, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb some stairs without – climb a few stairs at a reasonable pace with the use of a handrail, can prepare simple meals and feed herself, can care for personal hygiene, can sort, handle, and use paper files.  This person should avoid forceful gripping and grasping with the left hand, and, as mentioned, she is right hand dominant.

(AR 1009-11.)  The VE testified that such a person could perform Plaintiff's past relevant work, as well as alternative work in food prep, as a cafeteria attendant, and as a hand packager.  (AR 10011.)

At Step 4 of the decision, the ALJ combined parts of hypotheticals one and six to find Plaintiff has the RFC to (1) lift and carry 100 pounds occasionally, 50 pounds frequently, and 20

pounds continuously; (2) stand and/or walk eight hours and sit eight-hours in an eight-hour workday; (3) occasionally kneel, crouch, and crawl; (4) maintain attention and concentration to carry out simple job instructions; and (5) relate to and interact with coworkers, supervisors, and the general public; with the additional restrictions that she (1) is unable to carry out an extensive variety of technical and/or complex instructions; and (2) must avoid forceful gripping, grasping, and torqueing with the left hand.  (AR 696.)

Though the ALJ ultimately incorporated all of Plaintiff's medically substantiated impairments and limitations into his RFC, none of the hypotheticals he posed to the VE properly presented the VE with a hypothetical containing all Plaintiff's mental and physical impairments in combination.  *Magallenes*, 881 F.2d at 756; *Embrey*, 849 F.2d at 422.   Because of this failure, the VE's testimony as to jobs in the national economy Plaintiff can perform lacks evidentiary value. *See DeLorme*, 924 F.2d 841, 850 (9th Cir. 1991).   On remand, the ALJ must pose a single hypothetical to the VE incorporating all of Plaintiff's medically supported impairments.

In sum, remand is required because the ALJ failed to elicit an explanation for the conflict between the VE's testimony and the DOT in regard to Plaintiff's ability to speak English or to address Plaintiff's language and literacy impairments.  On remand, the ALJ should further pose a hypothetical combining all of Plaintiff's medically supported mental and physical impairments.

**B.      The ALJ Articulated Legitimate and Specific Reasons for Rejecting Nurse Guyette's Opinion**

Plaintiff contends the ALJ erred by discounting Nurse Guyette's opinion as "overly restrictive based on the overall record and findings of Dr. Fernandez."  (Doc. 15, 18 (citing AR 699).)  Plaintiff argues that the ALJ failed to "cite any evidence from the record" to support this finding, and failed to "set out a detailed and thorough summary of the facts and conflicting medical evidence" as required.  (Doc. 15, 20.)  The Commissioner contends the "ALJ discussed both [Nurse] Guyette's and Dr. Fernandez's findings and opinions in detail" and properly resolved conflicts within the medical record.  (Doc. 16, 9-10.)

//

//

1    **1.    Legal Standard**

2    Though they may have a treating relationship with a claimant, a "Nurse Practitioner" is an

3    "other source" – not an "acceptable medical source" comparable to a treating physician.  20 C.F.R.

4    §§ 404.1513(d), 416.913(d).  The opinion of an acceptable medical source is given more weight

5    than that of an "other source."  20 C.F.R. §§ 404.1527, 416.927.  However, the ALJ is required to

6    "consider observations by non-medical sources as to how an impairment affects a claimant's

7    ability to work."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).  Non-medical testimony

8    can never establish a diagnosis or disability absent corroborating competent medical evidence.

9    *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  The ALJ is obligated to give reasons

10   germane to "other source" testimony before discounting it.  *Dodrill v. Shalala*, 12 F.3d 915, 919

11   (9th Cir. 1993); *see* 20 C.F.R. § 404.1513(e)(2).

12   **2.    The ALJ Did Not Err in Discounting Nurse Guyette's Opinion**

13   Although the ALJ was not required to give Nurse Guyette's opinion weight because Nurse

14   Practitioners   are   not   "acceptable   medical   sources"   under   the   regulations,   20   C.F.R.

15   §§ 404.1513(d), 416.913(d), the ALJ appropriately accorded "some weight" as Nurse Guyette had

16   observed how Plaintiff's impairments affected her ability to work during the course of their

17   treating relationship, *Sprague*, 812 F.2d at 1232.  The ALJ noted that Nurse Guyette "did appear

18   to be working with" Plaintiff's treating physician Dr. Pentschev, and therefore credited her

19   observations to the extent they did not conflict with the rest of the medical record.  (AR 699).

20   The ALJ noted that Nurse Guyette opined Plaintiff could only lift up to 20 pounds occasionally

21   and 10 pounds frequently; could carry up to 10 pounds occasionally due to back pain radiating to

22   her extremities; could sit four hours, stand three hours, and walk two hours in an eight-hour

23   workday; could never climb, stoop, crouch, kneel, or crawl; could occasionally balance, reach,

24   push, or pull; and had additional environmental restrictions.  (AR 699; *see* AR 236-39.)  However,

25   the ALJ rejected Nurse Guyette's opinion as inconsistent with Dr. Fernandez's physical

26   examination, which found Plaintiff's level of restriction to be less than that opined to by Nurse

27   Guyette.  (AR 699.)

28   //

1   The ALJ noted that consultative examiner Dr. Fernandez had found Plaintiff "had no

2   limitation in lifting, standing, sitting, squatting, or bending . . . and had no limitation in handling,

3   reaching, grasping, fingering, or feeling."  (AR 701.)  Further, directly contradicting the extreme

4   limitations opined to by Nurse Guyette, Dr. Fernandez opined that Plaintiff "could lift and carry

5   up to 100 pounds occasionally and up to 50 pounds frequently . . . could stand, walk, and sit for

6   eight hours each in an eight-hour workday, [could] occasionally kneel, crouch, and crawl due to

7   left knee pain[.]"  (AR 701.)  These limitations are dramatically less than those opined to by Nurse

8   Guyette.  Dr. Fernandez is an acceptable medical source entitled to more weight than Nurse

9   Guyette, an "other source" under the regulations, and Dr. Fernandez's opinion which directly

10  contradicts Nurse Guyette's opinion is a sufficiently germane reason to discount Nurse Guyette's

11  opinion.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical

12  evidence is a germane reason for rejecting lay witness evidence).

13  In sum, the ALJ gave a germane reason for rejecting Nurse Guyette's opinion and the ALJ

14  did not err.

15  **B.    Remand is Appropriate**

16  Remand is appropriate when, like here, a decision does not adequately explain how a

17  conclusion was reached, "[a]nd that is so even if [the Commissioner] can offer proper post hoc

18  explanations for such unexplained conclusion," for "the Commissioner's decision must stand or

19  fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Barbato*

20  *v. Comm'r of Soc. Sec.*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (internal citations omitted);

21  *Ceguerra*, 933 F.2d at 738 (the Court cannot affirm the ALJ's conclusions on grounds that were

22  not invoked by the agency).

23  The ALJ's decision was based on an improper reliance on the VE's testimony, which

24  conflicted without explanation from the DOT and failed to consider Plaintiff's full extent of

25  medically supported impairments in combination.  The Court therefore reverses and remands this

26  case to the Commissioner for reconsideration of Plaintiff's mental and physical impairments and

27  illiteracy and such other issues as may be affected by this error, and to conduct such further

28  proceedings and engage in such further consideration as may be appropriate

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.   The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Maria Mendoza, and against Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 23, 2015**                              **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE